## COMMONWEALTH vs. CHE BARNES.

No. 93-P-1692.

Suffolk. November 13, 1995. - July 8, 1996.

Present: PERRETTA, IRELAND, & FLANNERY, JJ.

*Practice, Criminal,* Motion to suppress, Arraignment, Delay in commencement of prosecution, Venue, Conduct of prosecutor, Witness, Instructions to jury, Sentence. *Error, Harmless. Evidence,* Admissions and confessions, Joint enterprise. *Due Process of Law,* Delay in commencement of prosecution, Fair trial. *Witness,* Credibility. *Intoxication. Joint Enterprise. Intent.*

At a criminal trial error, if any, in the denial of a criminal defendant's motion to suppress evidence was harmless where nothing seized pursuant to the warrant was relevant to the issue of the defendant's participation in the crimes alleged. [668]

The record of criminal proceedings did not support a defendant's claim on appeal that the police interfered with his right to counsel by holding him for interrogation rather than promptly bringing him to court for arraignment. [668-669]

At the trial of a notorious criminal case, the judge properly denied the defendant's motion for a change of venue: nothing in the record gave any indication or suggestion that the defendant was tried by a prejudiced jury. [669-670]

At the trial of a murder indictment, the record did not support the defendant's claim of prosecutorial misconduct with respect to certain items marked for identification but not introduced in evidence. [670-672]

At the trial of a murder indictment, the circumstances of a juvenile codefendant's testimony demonstrated that the jury could not have been misled into accepting his version of events because his treatment as a juvenile was contingent on his truthfulness, and the judge correctly refused to instruct the jury on promises, rewards or inducements in evaluating that witness's testimony. [672-675]

At a murder trial, error, if any, in the judge's refusal to give to the jury a separate intoxication instruction on the defendant's ability to form the shared intent required to support a joint enterprise theory would not warrant reversal of the defendant's convictions, where the defendant had not raised the issue of intoxication during the trial. [675-677]

INDICTMENTS found and returned in the Superior Court Department on January 3, 1991.

Pretrial motions to suppress evidence and to dismiss were heard by *Robert A. Mulligan,* J., and the cases were tried before him.

*Murray A. Kohn* for the defendant.

*Annemarie Relyea-Chew,* Special Assistant District Attorney, for the Commonwealth.

PERRETTA, J. On the night of October 31, 1990, in the Franklin Field area of Boston, the defendant and seven other males decided to seek out women they believed to be prostitutes and rob them. When they saw two women, they divided themselves into two groups. The defendant and his group chased one woman (Linda),[1] hit her over the head, and searched her for money, but she had none. Her assailants then crossed the street to join the rest of their group, who had lifted the second woman, Kimberly Rae Harbour, over their heads and were carrying her across a parking lot, down a hill, and into a shallow decline in Franklin Field. There the eight males brutally beat, stabbed, and raped her. She died of multiple stab wounds and blunt force injuries. On appeal, the defendant makes numerous allegations of error in his trial, none of which results in a reversal of his convictions of armed robbery, aggravated rape, and manslaughter.[2] He also claims that his sentences are unconstitutionally excessive. We affirm the judgments.

1. *Background.* An understanding of the issues raised on appeal does not require a detailed recitation of the evidence. As background for several of the allegations of error, it is sufficient to note that on the morning of the arrests of the eight participants, the defendant gave a lengthy statement to the police which was admitted in evidence at his trial and which is not challenged on appeal. In that statement, the defendant admitted to his armed assault of Linda and his presence in Franklin Field during the rape, beating, and stabbing of Harbour. However, he denied all participation in those crimes and described himself, essentially, as an observer who did no more than retrieve Harbour's scattered clothing after she was dead and destroy it in order to protect his "boys." Another

[1]A fictitious name.

[2]The defendant was also found guilty of an armed assault of the first victim with intent to rob. Although the defendant conceded his guilt on that indictment in closing argument, he nonetheless noticed an appeal from that conviction.

participant in the attacks, a juvenile, testified for the Commonwealth and related that the defendant was one of the two originators of the plan to seek out and rob women. He described how the defendant assaulted the first woman and how he repeatedly kicked and beat Harbour over the head and on the back with a tree limb while and after she was raped. The Commonwealth proceeded against the defendant as a principal and a joint venturer.

2. *The search warrant.* At about 5:45 A.M., on November 19, 1990, the police arrived at the defendant's residence with a warrant for his arrest and a warrant to search the premises. The defendant argues that various items of clothing seized pursuant to the search warrant should have been suppressed as evidence because the warrant issued without a showing of probable cause that the items sought would be found in his apartment eighteen days after the attacks.

We need not decide whether it was error to deny the defendant's motion. In light of his lengthy statement to the police in which he admitted to his attack upon one woman and his presence during the crimes against Harbour, the real issue at trial was whether the defendant was an active participant in the crimes committed in Franklin Field. Because there was nothing in the items seized that was relevant to that question, any error in the denial of the motion would be harmless beyond a reasonable doubt. See *Commonwealth* v. *Perez*, 411 Mass. 249, 260 n.8 (1991). Cf. *Commonwealth* v. *Judge*, 420 Mass. 433, 451 (1995).

3. *Postarrest delay.* Claiming that the police interfered with his right to counsel by holding him for interrogation rather than promptly bringing him to court for arraignment, the defendant sought dismissal of the indictments against him. In denying the motion, the judge made the following findings of fact.

After arresting the defendant and executing the search warrant, the police returned to the police station. It was then about 7:15 A.M. The defendant was given his Miranda warnings for the second time and taken through the booking procedures. After he was again advised of his Miranda rights, he signed a waiver form and gave a detailed statement to the police. The police next asked if he was willing to give a recorded statement, and the defendant agreed. The tape recorder was turned on at 8:48 A.M., and the defendant spoke for

fifty-six minutes. The tape was played back to the defendant, who agreed to its accuracy and made a few additions. The tape recording ended at 10:37 A.M.

After giving his statement, the defendant was taken from the homicide division in South Boston to the identification unit at Station Four in the South End. He was photographed and finger and hand prints were taken. He arrived at the Dorchester District Court sometime after 1:00 P.M.

In the meantime, however, at 9:05 A.M., someone from the Committee for Public Counsel Services (Committee) had called an attorney who agreed to be available for the defendant's arraignment. This attorney's associate was present at the Dorchester District Court at about 10:15 A.M., and the attorney himself arrived about one hour after that. Their attempts to determine the defendant's location were unsuccessful. There was, however, no evidence that the police knew that the Committee had arranged for counsel for the defendant or that they interfered with the defendant's access to counsel.

Finding as matter of fact that the police did not interfere with the defendant's right to consult with an attorney and concluding as matter of law that "[t]here is no requirement that the police actively seek counsel for an arrestee where he has not requested a lawyer," the judge denied the motion. The defendant does not and cannot challenge the evidentiary support for the judge's findings of fact. Based upon those findings and *Commonwealth* v. *Rosario*, 422 Mass. 48, 56 (1996) ("An otherwise admissible statement is not to be excluded on the ground of unreasonable delay in arraignment, if the statement is made within six hours of the arrest . . ."), we see no error in the denial of the defendant's motion to dismiss the indictments.

4. *Change of venue.* Alleging "intense prejudicial pre-trial publicity," the defendant sought a change of venue. The trial judge denied the motion, and the defendant argues on appeal that, because of the extensive pretrial publicity, he could not have had an unbiased jury and a fair trial.

There can be no dispute concerning the nature and extent of the publicity this case received from the news media. However, the "mere existence of pre-trial publicity itself is not sufficient to require reversal of a conviction. *Sheppard* v. *Maxwell*, 384 U. S. 333, 354-355 (1966). It constitutes a denial

of due process only where the petitioner can show that such publicity deprived him of his right to a fair trial." *Delle Chiaie* v. *Commonwealth*, 367 Mass. 527, 532 (1975). We conclude that the defendant's complaint of unfairness is contradicted by the transcript, which shows that the jury were impaneled in the same way as the jury in *Commonwealth* v. *Bianco*, 388 Mass. 358, 368 (1983): "[T]he judge conducted an individual voir dire of each prospective juror, made a thorough and careful inquiry about pretrial publicity, and satisfied himself that each juror could render a fair and impartial verdict. . . . The judge not only asked prospective jurors the questions required by G. L. c. 234, § 28, but he asked each juror numerous additional questions appropriate to a determination of impartiality. . . . The trial judge is . . . entitled 'to accept, without more, the declaration of the jurors as to their disinterest and freedom from emotional or intellectual commitment.' *Commonwealth* v. *Gilday*, 367 Mass. 474, 492 (1975). *Commonwealth* v. *Subilosky*, 352 Mass. 153, 159 (1967)." See also *Commonwealth* v. *Colon*, 408 Mass. 419, 435-437 (1990).

Additionally, the transcript shows that the defendant's exhaustion of his peremptory challenges was strategic rather than real. After the defendant announced that he was "content" with the jury, he realized that he had one peremptory challenge remaining. He then asked to be allowed to withdraw his statement of satisfaction with the jury and challenge the last juror so that on any appeal he would not be held to a waiver of any claim he might have concerning his motion for change of venue. See *Delle Chiaie* v. *Commonwealth*, 367 Mass. at 532; *Commonwealth* v. *Colon*, 408 Mass. at 437. The trial judge granted the request but warned of the risk. When a new juror was called, questioned, and declared impartial, defense counsel stated, "We take no position obviously." When the trial judge asked specifically whether the defendant was content, counsel responded, "Yes."

There is nothing in the transcript that gives any indication or suggestion that the defendant was tried by a prejudiced jury.

5. *Prosecutorial misconduct.* During the testimony of the officer who executed the search warrant for the defendant's premises, the prosecutor asked him to identify the many items

seized, including two axe handles. An inflammatory expression followed by a sobriquet, "Crazy C," had been chiseled and inked into one of the handles. The defendant objected to the handles being marked for identification on the basis that they were irrelevant and highly prejudicial and that, even if only marked for identification, the jury would be able to see them.

At side bar, the prosecutor argued that the defendant had admitted that he had hit Linda with a "stick" and there was evidence to show that the defendant had a "stick" in Franklin Field. It was the prosecutor's intention to put the handles in evidence after the medical examiner testified, as expected, that the handles were consistent with certain marks found on Harbour's body. The trial judge ruled that the anticipated medical examiner's testimony would provide sufficient basis for the admissibility of the handles. See *Commonwealth* v. *Toro*, 395 Mass. 354, 356-357 (1985). He allowed the officer to identify the items seized pursuant to the warrant, including the handles, and instructed the jury on the distinction between items marked for identification and evidence and what could and could not be considered by them.

Although the handles were marked for identification, the prosecutor did not thereafter seek to put them in evidence. It is the defendant's position that the prosecutor engaged in misconduct by making the handles visible to the jury while knowing that there was no basis for their admission in evidence. He argues that this alleged misconduct requires reversal of his convictions. See *Commonwealth* v. *Hoppin*, 387 Mass. 25, 28-31 (1982), where, during closing argument, the prosecutor, unobserved by the trial judge, used an "oratorical prop" and displayed to the jury a piece of rawhide that fit the victim's description at trial of a leather thong which had been used to bind her but which was never found and was, therefore, not part of the evidence.

The circumstances in the present case do not support the allegations of prosecutorial misconduct. The defendant raised the issue of the admissibility of the handles at the outset by a pretrial motion in limine. At that time, the trial judge precluded the prosecutor from mentioning the handles in his opening statement. The prosecutor accepted that ruling without protest, and told the jury that the medical examiner would describe how some of Harbour's many injuries were

consistent with having been struck with a tree limb as well as with something harder and less flexible.

In his opening statement, the defendant told the jury that the only evidence that would be presented to link the defendant to the crimes against Harbour would be the testimony of a juvenile participant who had made a "deal" for leniency in exchange for his testimony against the defendant.

When the issue of the admissibility of the handles came up again during the officer's testimony about the search of the defendant's premises, the trial judge questioned whether the handles, if put in evidence, would needlessly complicate the case. In response, the prosecutor explained that the relevance of the handles depended in large measure upon the theory of defense. He anticipated, based upon the defendant's opening statement, that the defendant intended to argue that Harbour was beaten with only one blunt weapon. He also expected the defendant to cross-examine the juvenile witness about prior statements he had made to the police which would be inconsistent with his anticipated trial testimony but consistent with the defendant's recorded statement already heard by the jury — that another participant and not the defendant beat Harbour with a stick. The prosecutor stated that, on that basis, he intended to offer the handles previously marked for identification in evidence after the juvenile witness's testimony that the defendant beat Harbour and during the medical examiner's testimony describing her injuries. Defense counsel said nothing to dispel the prosecutor's conjecture about the theory of defense.

In light of these circumstances, we see no misconduct on the part of the prosecutor. He made his position known to the trial judge, who expressed the view that the medical examiner's testimony would provide sufficient basis for the admissibility of the handles. See *Commonwealth* v. *Toro,* 395 Mass. at 356-357. If, upon further reflection and after defense counsel's cross-examination of the juvenile witness, the prosecutor decided not to offer the items, that was not misconduct. Compare *Commonwealth* v. *Hoppin,* 387 Mass. at 28-31.

6. *The credibility of the juvenile witness.* There was evidence, the testimony of a juvenile participant in the crimes, to show that while and after Harbour was repeatedly raped, hit in the face with a bottle, and stabbed, the defendant beat her

over the head about eight to ten times with a "stick," a tree limb three and one-half to four feet in length, and kicked her. At the time of his arrest, however, this witness had given two statements to the police, neither of which inculpated the defendant in the rape, beating, and murder of Harbour.

Throughout the trial, the defendant attributed this dramatic change between the witness's statements and his trial testimony to a promise made by the Commonwealth, viz., the witness would be tried as a juvenile offender in exchange for his testimony against the defendant. The defendant argues on appeal that this agreement required the trial judge to instruct the jury consistently with *Commonwealth* v. *Ciampa*, 406 Mass. 257, 266 (1989), and that his failure to do so constitutes prejudicial error.[3]

In *Ciampa, supra,* the court stated that a judge is expected to "focus the jury's attention on the particular care they must give in evaluating testimony given pursuant to a plea agreement that is contingent on the witness's telling the truth." Here the trial judge instructed the jury on the many factors that could be considered by them in determining the "believability, the credibility of the various persons who testified" and stated that they could "also consider whether there were any promises, rewards, or inducements for a witness to testify."

The facts pertinent to the alleged "deal" between the juvenile witness and the Commonwealth are as follows. When the juvenile was arrested, he gave two statements to the police in which he essentially denied his involvement and said nothing inculpatory of the defendant. After a hearing but before a ruling on the Commonwealth's motion to transfer him to Superior Court (see G. L. c. 119, § 61, as appearing in St. 1990, c. 267, § 3), the juvenile gave another statement to the

---

[3]The Commonwealth argues that because defense counsel made no specific reference to *Ciampa, supra,* in his written requests for jury instructions or in his objection at the conclusion of the charge, the more stringent "substantial risk of a miscarriage of justice" standard of review applies. We do not agree. Although the defendant made no reference to *Ciampa* in his written requests, those requests were entirely consistent with its holding. More importantly, the transcript shows that the trial judge was more than aware of defense counsel's position, that is, that because the juvenile witness's testimony against the defendant was contingent upon an agreement for lenient treatment by the Commonwealth, the jury should be instructed to evaluate that testimony with particular care. We conclude that the defendant's right to appellate review of this issue was preserved. See *Commonwealth* v. *Jewett*, 392 Mass. 558, 561-562 (1984).

police. In this statement, which was consistent with his testimony at the defendant's trial, the juvenile admitted his participation in the crimes and also described how the defendant beat and kicked Harbour. About a month after this third statement from the juvenile, the Commonwealth's motion to transfer was denied.[4]

It appears from the record that the juvenile's statement could have been the result of negotiation with the Commonwealth. As set out in the Commonwealth's response to the defendant's motion to be furnished with statements or promises, rewards, or inducements regarding the juvenile, the third statement was given under the following circumstances:

"As a result of continuing discussions between counsel for [the juvenile] and the Commonwealth, [the juvenile] agreed to provide a statement to the Boston Police and to testify truthfully in the cases against the co-defendants. In exchange, the Commonwealth agreed that [the juvenile] could plead guilty as a juvenile only to the charges of armed robbery and murder, and the charge of rape would be placed on file.

"[The juvenile] has availed himself of the provisions of this agreement to the extent that it aided him in remaining in the juvenile justice system; however, he sought and received a jury trial on all of the complaints.

"[The juvenile] gave a statement to the police on August 30, 1991, and the Commonwealth expects him to testify in subsequent trials of the co-defendants."

When the juvenile refused to plead guilty, the Commonwealth proceeded to trial in the Juvenile Court on all the charges, and a jury returned verdicts finding him delinquent by reason of armed robbery, aggravated rape, and murder in the first degree. At the defendant's trial, the juvenile was extensively cross-examined about his three statements to the police, the dates upon which he made them, and his knowledge of the consequences of being treated as a juvenile, that is, that he knew he would be released from custody upon attaining the age of eighteen years. He further stated that he knew that his commitment to the custody of the Department of Youth Services was final and that irrespective of whether

---

[4]In his memorandum of decision on the Commonwealth's motion to transfer, the District Court judge made no reference to the juvenile's statement to the police.

the Commonwealth was dissatisfied with his testimony, he could not be transferred to the Superior Court and tried as an adult for his participation in the crimes against Harbour.

The circumstances of the juvenile's testimony show that the jury could not have been misled into accepting his version of events because his treatment as a juvenile was contingent upon the truthfulness of his testimony. As correctly noted by the trial judge at side bar, "at this present time there [are] no promises, rewards or inducements hanging over his head." See generally Ireland, Massachusetts Juvenile Law §§ 35 & 36 (1993). We see no error in the trial judge's refusal to caution the jury in their evaluation of the credibility of the juvenile witness. See *Commonwealth* v. *Colon*, 408 Mass. 419, 445 (1990); *Commonwealth* v. *Evans*, 415 Mass. 422, 427 (1993); *Commonwealth* v. *Fuller*, 421 Mass. 400, 413 (1995).[5]

7. *Intoxication instructions.* There was sufficient evidence, the juvenile's testimony that the defendant appeared drunk to him and the defendant's recorded statement that all the participants in the crime had been drinking beer, to warrant the trial judge's instructions on the defendant's intoxication as it may have affected his ability to form the specific intent required for the crimes of armed assault with intent to rob, armed robbery, and murder. Relying upon *Commonwealth* v. *Parker*, 402 Mass. 333, 336 (1988), the defendant claims that the trial judge erred in refusing to give a separate intoxication instruction on his "knowledge and ability to share the specific intent to be convicted as a joint venturer."

There is nothing in *Parker* that requires a trial judge to give a separate intoxication instruction on the ability to form a shared intent when the Commonwealth proceeds on a joint venture theory of guilt. Rather, *Parker* held that it was error to instruct the jury that they could *not* consider intoxication "as it may have affected [the defendant's] ability to form the shared intent required to support a joint enterprise theory." *Ibid.*

In the instant case, the trial judge correctly instructed the jury on the elements of joint venture, which included the requirement that the defendant "must share the mental state

---

[5]We find no substantial risk of a miscarriage of justice in the prosecutor's closing remarks concerning the truthfulness of the juvenile's testimony. See *Commonwealth* v. *Glass*, 401 Mass. 799, 806-807 (1988); *Commonwealth* v. *Connors*, 18 Mass. App. Ct. 285, 292-293 (1984).

or intent of the person perpetrating the crime." The instructions also made clear that the Commonwealth had the burden of proving that the defendant shared the requisite specific intent to commit certain of the crimes charged in the indictments. Although the instructions on intoxication were linked to specific intent, the trial judge said nothing that precluded the jury from considering the evidence of the defendant's consumption of alcohol on his ability to form a shared intent. See *Commonwealth* v. *Ferreira,* 417 Mass. 592, 595 (1994).

Even were there error in the instructions on joint venture and intoxication, we would conclude that any such error was not prejudicial. We see nothing in the evidence to show that the defendant raised the issue of his consumption of alcohol as a mitigating factor at any point during the trial other than in his written requests for jury instructions. "He did not suggest or even intimate that, as a result of his drinking, he was incapable of forming the requisite specific intent." *Commonwealth* v. *Fano,* 400 Mass. 296, 306 (1987). Indeed, his argument was to the contrary.

It was the theory of defense, as manifested in defense counsel's opening statement, questioning of the witnesses, and closing argument, that although the defendant agreed to rob prostitutes and in fact assaulted Linda with the specific intent to rob her, he withdrew from the joint venture in respect to Harbour. As put by defense counsel in his closing argument: "[W]hen he came upon Kimberly Rae Harbour and found out that the robbery was in effect complete, a failed robbery if you will, he wanted to leave. And they said no. And the frenzy began."

Defense counsel argued that the only evidence of his participation in the crimes against Harbour was the testimony of the juvenile, who should not be believed because of his "deal" with the Commonwealth. As for the fact that the defendant admittedly burned Harbour's clothing in a dumpster, the defendant was motivated by a twisted sense of obligation to protect his "boys" rather than a desire that the joint venture from which he had withdrawn succeed. Consistent with the theory of defense, the trial judge included in his instructions on joint venture the elements of withdrawal from the venture.

In light of the theory of defense, any error in the trial judge's refusal to give a separate intoxication instruction on

the defendant's ability to form the shared intent required to support a joint enterprise theory would not warrant reversal of the defendant's convictions. See *Commonwealth* v. *Lawrence*, 404 Mass. 378, 395 (1989); *Commonwealth* v. *Sires*, 413 Mass, 292, 300 (1992); *Commonwealth* v. *Pierce*, 419 Mass. 28, 39 (1994).

8. *The sentences.* Based upon the fact that the jury acquitted him of murder, the defendant argues that the concurrent sentences of forty to sixty years' incarceration imposed upon him on the aggravated rape and armed robbery convictions are unconstitutionally excessive. We do not agree. "The sentences imposed do not 'shock[ ] the conscience and offend[ ] fundamental notions of human dignity.' *Commonwealth* v. *Jackson*, 369 Mass. 904, 910 (1976), quoting *In re Lynch*, 8 Cal. 3d 410, 424 (1972)." *Commonwealth* v. *Sanchez*, 405 Mass. 369, 380 (1989).

*Judgments affirmed.*