## Commonwealth *vs.* Albert Wilson.

Suffolk. January 6, 1998. - April 22, 1998.

Present: Wilkins, C.J., Lynch, Greaney, Fried, & Ireland, JJ.

*Search and Seizure,* Warrant, Affidavit, Probable cause, Plain view. *Constitutional Law,* Search and seizure. *Probable Cause. Homicide. Practice, Criminal,* Capital case, Severance, Trial of indictments together, Fair trial, Argument by prosecutor, Instructions to jury, Reasonable doubt, Polling of jury. *Evidence,* Hearsay, Cumulative, Motive, Relevancy and materiality. *Error, Harmless.*

Affidavits in support of search warrants provided probable cause for the issuance of warrants to search the defendant's vehicle, his house, and his mother's house, and evidence seized therein either pursuant to the warrants or in plain view was properly admitted at his trial [342-344]; further, error, if any, in the admission in evidence of an item seized pursuant to an assertedly invalid warrant was harmless beyond a reasonable doubt [344-345].

A criminal defendant did not demonstrate that the offenses in two sets of indictments were not related so as to warrant severance at trial, nor did he demonstrate compelling prejudice in the judge's denial of his motion to sever the sets of indictments. [345-347]

At the trial of murder indictments, improperly admitted hearsay evidence of the victim's state of mind was not prejudicial, where it was merely cumulative of properly admitted evidence of the defendant's hostility toward the victim and where the evidence of the defendant's guilt was overwhelming. [347-349]

At the trial of a criminal case, statements of a nontestifying witness were properly admitted as excited utterances and the statements were relevant where they rationally tended to demonstrate the defendant's motive to kill the victims. [349-350]

There was no merit to a criminal defendant's challenge at trial to testimony clearly admissible to substantiate the reliability of the testifying witness's identification of the defendant. [350]

At the trial of a criminal case, the prosecutor in closing argument did not improperly excessively appeal to the jury's sympathy [350-351], improperly vouch for the Commonwealth's case [351-352], or improperly refer to certain facts not in evidence [352-353]; further, in light of the overwhelming evidence of the defendant's guilt, two misstatements the prosecutor did make did not constitute reversible error [353].

At the trial of murder indictments, no substantial likelihood of a miscarriage of justice was created by the judge's instructions on drawing inferences from circumstantial evidence [354]; and the judge's reference therein to a jigsaw puzzle as an analogy could not have misled reasonable jurors with

respect to the Commonwealth's burden of proof, in light of a supplemental instruction and the judge's original instructions on reasonable doubt [354-355].

At a murder trial, there was no error in the judge's instruction on proof beyond a reasonable doubt [355]; and no substantial likelihood of a miscarriage of justice was created by the judge's misstatement of a single word in that instruction, which could not have confused the jury [355-356].

The judge at a murder trial properly refused to poll the jury, where there was no evidence that the verdicts were not unanimous. [356]

There was no basis on the record of a murder trial for this court to grant any relief under G. L. c. 278, § 33E. [356]

INDICTMENTS found and returned in the Superior Court Department on June 23, 1993, and July 23, 1993.

Pretrial motions to suppress evidence were heard by *James D. McDaniel, Jr.,* J., and the cases were tried before *Robert W. Banks,* J.

*Robert S. Sinsheimer (Debra Burns Theodorou* with him) for the defendant.

*Paul B. Linn,* Assistant District Attorney *(James W. Coffey,* Assistant District Attorney, with him) for the Commonwealth.

IRELAND, J. The defendant was convicted on three indictments charging murder in the first degree, with each conviction based on the theories of deliberate premeditation and extreme atrocity or cruelty. The defendant was also convicted on three indictments charging assault by means of a dangerous weapon and one indictment charging unlawful possession of dangerous weapons, namely knives. These latter charges were contained in separate indictments returned by a different grand jury. The defendant claims that the judge erred in (1) denying his motion to suppress evidence obtained pursuant to various search warrants; (2) denying his motion to sever the charges in the separate indictments against him; (3) admitting various hearsay statements in evidence; (4) instructing the jury on reasonable doubt; and (5) denying his request to poll the jurors. The defendant also claims that the prosecutor committed reversible error in his closing statement. Finally, the defendant requests that we exercise our plenary power under G. L. c. 278, § 33E, to order a new trial. For the reasons set forth below, we affirm the convictions and decline to exercise our power under G. L. c. 278, § 33E.

We recount the Commonwealth's evidence in some detail.

The murder victims, Jack Bushey, Steven Zaborski, and Denise McLaughlin, were stabbed and shot to death on June 13, 1993, in an apartment on Washington Street in the West Roxbury section of Boston. Bushey and Zaborski had been living in the apartment with a third individual, James Linehan. McLaughlin had been Zaborski's girl friend and often stayed at the apartment.

Two days prior to the murders, the defendant visited the victims' apartment. While alone in one of the bedrooms with Zaborski, the defendant threatened to kill Zaborski, Bushey, Linehan, and another individual because the defendant thought that one or more of them had raped his wife. Zaborski denied the rape allegations. Linehan heard the threats and Zaborski's denial from a nearby room. At some time later that evening, Zaborski told Linehan that the defendant also had placed a .25 caliber handgun to Zaborski's head while making the threats.

At about 11:20 P.M. on June 12, an individual named William Curtis was driving home from work and stopped for a traffic light at a well-lit intersection on Washington Street, near the victims' apartment building. He saw the defendant pacing back and forth near the corner, about twenty feet away. Curtis then saw an elderly woman walking toward the defendant. Curtis's mother had been mugged a few years earlier and Curtis was concerned for the safety of the elderly woman. Curtis remained at the corner for about two and one-half minutes, until the woman had passed safely.[1]

At 5:27 A.M. on June 13, two Boston police officers responded to a radio report of a man passed out on the sidewalk in front of the victims' building. The officers had driven past the building about twenty minutes earlier and had not seen anything then. On arriving, the officers found Bushey's body lying on the sidewalk in a pool of blood. The autopsy report determined that Bushey had a shotgun wound from close range to his neck and jaw area and eight stab wounds to his chest, back, and legs, including a wound to his chest seven inches deep.

The officers followed a trail of blood back to the victims' apartment. On entering, they found Zaborski's body in a bedroom, face down in a pool of blood. His hands, feet, and head were bound with duct tape. The autopsy report determined

---

[1]Curtis related his observations to the police on June 30, 1993, after he had seen a photograph of the defendant in the newspaper.

that he had five stab wounds to his chest, sides, and arms, including a wound almost seven inches deep to his chest. He also had several abrasions on his face, neck, and sides that were consistent with having been caused by the tip of a knife.

The officers then found McLaughlin's body at the bottom of a flight of stairs, slumped against the back door of the building. The autopsy report determined that she had shotgun wounds from close range to her chest and abdomen, a gunshot wound to her right shoulder and right hand, and a stab wound to her arm. She also had several lacerations on her breasts. Shortly thereafter, the police located Linehan, who had spent the night at a friend's home. After interviewing Linehan, the police immediately focused their investigation on the defendant.

Pursuant to a warrant, the police searched the victims' apartment. They found three spent .25 caliber casings and a spent .25 caliber bullet. A spent .25 caliber bullet was later recovered from McLaughlin's body. A police expert testified that the three casings and the two bullets had all been fired from the same gun. The police also found a piece of duct tape, with the fingertips from a pair of rubber surgical gloves stuck to it, in a wastebasket in the apartment. The police later found three more rubber surgical gloves in an old desk in an alley behind the apartment. The police also found evidence of type B blood in the apartment. All the victims had type O blood. The defendant has type B blood.[2]

The defendant spent the night of June 13 at his mother's house in West Roxbury. The next day at about 10:10 A.M., he called for a taxicab and instructed the driver to go toward a restaurant on Washington Street in Dedham. The defendant was carrying what appeared to be a gym bag and a duffel bag, both of which appeared to be full. Just after crossing into Dedham, the defendant told the driver to stop, at no apparent specific address. The defendant got out of the taxicab with his bags and shortly thereafter began walking toward Draper Field, a large wooded area that was a short distance away.

Several witnesses saw the defendant early that afternoon in the Haymarket area of Boston, near the location of a methadone clinic that he regularly visited. He returned to his mother's house at some point in time. At about 8 P.M., the police arrived

_____

[2]Expert testimony at the trial indicated that about 10% to 12% of the Caucasian population has type B blood.

at his mother's house with a warrant for his arrest on charges of armed assault in a dwelling (stemming from the threats to Zaborski on June 11). The police found the defendant hiding in a coal bin in the cellar. He was armed with a rifle, ammunition, and several knives. There was a brief standoff, during which the police negotiated with the defendant in an attempt to get him to come out of the cellar. At some time, the defendant pointed his rifle at three police officers who were located outside the door of the coal bin. During the course of the standoff, the defendant made several statements to the effect, "What would you have done if your wife was raped?" The defendant also made statements that the whole thing had gotten out of control and that Linehan had set him up. The defendant ultimately surrendered peacefully. As the police escorted him out of the cellar, the defendant had no apparent trouble walking and showed no signs of intoxication. At the police station, a detective noticed that the defendant had a large cut on his thumb.

Over the next several days, the police obtained four search warrants, covering the defendant's vehicle, his locker and work area at his place of employment, his house, and his mother's house. The police recovered three rubber surgical gloves from the defendant's house and one from his locker at work. A prosecution expert testified that the gloves found behind the apartment and two of the gloves found at the defendant's house were similar in size and composition and could have come from the same source. The expert concluded that the other two gloves were from a different source.

The police recovered a spent .25 caliber casing at the defendant's house. A police expert testified that the casing matched those found in the victims' apartment and had been fired from the same gun. The police also found a carrying case for a shotgun or a rifle in the garage at the defendant's mother's house, and two knives in a closet inside the house. The knives were consistent with the victims' wounds and abrasions, and one knife had blood on both sides of the blade. The police were not able to locate the guns used in the murders.

On June 23, 1993, a Suffolk County grand jury returned three indictments charging the defendant with assault by means of a dangerous weapon and one indictment charging him with the unlawful possession of knives. These indictments stemmed from his arrest at his mother's house. One month later, another grand jury returned three indictments charging the defendant

with murder in the first degree, one indictment charging him with the illegal possession of a firearm, and one indictment charging him with stalking.[3]

The defendant filed pretrial motions to suppress evidence seized pursuant to the various search warrants and to sever the two sets of indictments. These motions were all denied. The defendant also filed a motion in limine to exclude as hearsay various statements made by his wife and by Zaborski. The judge excluded one statement that the defendant's wife made to police after the murders, but denied the rest of the motion.

At trial, the defendant testified on his own behalf. The essence of his testimony was that he denied having threatened or killed the victims, that he was asleep at his place of employment while off duty at the time of the murders, and that the cut on his hand was work related.[4] According to the defendant's testimony, he called the taxicab on the morning of June 14 because his vehicle would not start, and he was carrying one duffel bag of clothing when the taxicab arrived because he had intended to go to the Foxwoods Casino in Connecticut. He got out of the taxicab when he saw a drug dealer whom he knew (and from whom he then bought drugs), and he never made it to the Draper Field wooded area. He took a train to Boston later that morning to go to the methadone clinic. He supposed that he had left his duffel bag on the train, because he did not have it when he arrived in the Haymarket area that afternoon. He first learned of the murders from acquaintances he encountered in Haymarket, and he thought he had seen Linehan there. He left Haymarket and spent the rest of the afternoon ingesting cocaine and heroin in the Arboretum, a large public park and garden near West Roxbury. He returned to his mother's house at about 7:30 P.M. He was "high" on cocaine when the police arrived. He saw armed men in plain clothes emerging from a car. Afraid, he ran to the cellar, where he found a loaded rifle and some knives. He denied owning a shotgun or a .25 caliber gun. He

---

[3]The stalking charge related to allegations that the defendant went to various places on June 14 looking for Linehan and threatening to get even with him. The defendant was never indicted for the charges upon which his arrest warrant was issued, namely the threats to Zaborski on June 11. See *supra* at 340.

[4]One of the defendant's coworkers testified that he saw the defendant at his place of employment at about 10:15 P.M. on June 12. Another coworker testified that he saw the defendant at his place of employment at about 8:30 A.M. on June 13. The defendant testified that he often cut his hands because of the nature of his work repairing tires.

admitted to collecting knives and that he owned the knives found in the closet in his mother's home.

At the close of the Commonwealth's case, the judge allowed the defendant's motion for a required finding of not guilty on the indictment charging the defendant with stalking. At the close of the evidence, the judge also allowed the defendant's motion for a required finding of not guilty on the indictment charging the defendant with the illegal possession of a firearm. The remaining indictments went to the jury, and they found the defendant guilty on all the charges. This timely appeal followed.

1. *Suppression of evidence.* The defendant filed pretrial motions to suppress the evidence obtained pursuant to search warrants for his vehicle, his locker and work area at his place of employment, his house, and his mother's house. Each motion was denied. The defendant now argues that all the warrants were invalid because their supporting affidavits failed to establish probable cause to believe that any evidence of the murders would be found at the places to be searched.

An affidavit must contain sufficient information for an issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that the items reasonably may be expected to be located in the place to be searched at the time the search warrant issues. See *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983); *Commonwealth* v. *Cefalo*, 381 Mass. 319, 328 (1980). The nexus between the items sought and the place to be searched may be based on "the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide [evidence of the crime]." *Cinelli, supra,* quoting *United States* v. *Lucarz*, 430 F.2d 1051, 1055 (9th Cir. 1970). See *Commonwealth* v. *Allard*, 37 Mass. App. Ct. 676, 678 (1994). Here, the affidavits for each warrant essentially set out the defendant's motive to kill the victims, his threats to kill them, his standoff with the police prior to being arrested, the statements he made during that standoff, and other pertinent information. The police sought and obtained the four warrants in sequence, incorporating what they had found when executing preceding warrants into the subsequent affidavits.

The search warrant for the defendant's vehicle primarily covered hairs, fibers, secretions, blood, fingerprints, ammuni-

tion, and weapons. The supporting affidavit stated in particular that the defendant had been seen driving the vehicle several days before the murders, that the vehicle was registered in his name, that the vehicle was found parked in front of his mother's house the day after the murders, and that the distance between the site of the murders and the defendant's mother's house was in excess of two miles. This was sufficient to allow the magistrate to draw reasonable inferences that (1) because of the distance, the defendant needed a vehicle to travel from the crime scene to his mother's house; (2) the defendant used the vehicle registered in his name; and (3) because of the extremely violent nature of the crime, evidence of hair, fibers, or blood might be in the vehicle, as well as evidence pertaining to the weapons used in the crime. See *Commonwealth* v. *Beldotti*, 409 Mass. 553, 557 (1991). We thus conclude that there was probable cause for this warrant to issue.

The search warrant for the defendant's house covered only ammunition and rubber surgical gloves. The supporting affidavit contained no new information, except for the results of the previously executed warrant. The mere fact that the house was the defendant's residence does not establish probable cause for a search warrant to issue. See *Cinelli, supra* at 213. However, the police here were seeking only items that were "durable [and] of continuing utility to the defendant[]." *Commonwealth* v. *James*, 424 Mass. 770, 778 (1997). It is reasonably likely that such items could be found in a defendant's home after a crime, see *id*. (finding probable cause to search defendant's residence for knives, sneakers, clothing, and face masks); *Commonwealth* v. *Burt*, 393 Mass. 703, 715-716 (1985) (same for coins, tools, clothing, keys, and bank books); *Cinelli, supra* at 213 (same for ammunition), and a defendant is unlikely to dispose of such items because they are not inherently incriminating, see *James, supra*. This was sufficient to allow the magistrate to draw a reasonable inference that the evidence sought under the warrant could be in the defendant's house. We thus conclude that there was probable cause for this warrant to issue.

Further, even if we were to conclude that the term "ammunition" in the warrant did not also encompass used ammunition such as a spent casing (a question that we need not answer here), the police may seize evidence that they inadvertently find in plain view during the course of a search pursuant to a warrant, if they recognize the evidence to be plausibly related to

proof of criminal activity of which they are already aware. See *Commonwealth* v. *Alvarez*, 422 Mass. 198, 206 (1996); *Cefalo, supra* at 330-331; *Commonwealth* v. *Accaputo*, 380 Mass. 435, 447-448 (1980). Here, the spent .25 caliber casing was found under the defendant's bed. This was a reasonable place for police to be searching for the items covered under the valid warrant. There was no reason for the police to have anticipated the presence of the spent casing in the defendant's house. But once the police observed the casing, they had a reasonable basis to conclude that it was related to proof of the defendant's involvement in the murders. See *Alvarez, supra.* We thus conclude that admission of the spent .25 caliber casing was proper.

The search warrant for the defendant's mother's house covered ammunition, weapons, bloody clothing, and rubber surgical gloves. The accompanying affidavit stated in particular that the defendant had been arrested at his mother's house on the day following the murders and that he had not returned to his own house since the murders. The affidavit also stated that the previously executed searches had failed to discover weapons or ammunition with any apparent connection to the murders. This was sufficient to allow the magistrate to draw a reasonable inference that (1) the defendant went to his mother's house to clean up and change his clothes after committing the murders; and (2) evidence sought under the warrant could be in the defendant's mother's house. See *Beldotti, supra* at 557. We thus conclude that there was probable cause for this warrant to issue.

The warrant covering the defendant's locker and work area at his place of employment is more problematic. The supporting affidavits merely established that the defendant had access to these areas after the murders, but did not include any evidence suggesting that the items sought (primarily weapons, ammunition, and bloody clothing) might be located there. The motion judge relied on a statement in one of the affidavits that the defendant's wife had asked the defendant to remove his guns from their house and that, to her knowledge, the defendant had honored her request. From this, the motion judge concluded that the defendant might have stored these guns in one of his secured lockers at his place of employment.

We need not decide whether the affidavits were sufficient to establish probable cause for this warrant to issue. The only evidence seized from the defendant's place of employment and

used in the trial was a rubber surgical glove found in the defendant's locker. This glove differed substantially from the gloves found at or near the murder scene and contained no evidence connecting it to the murders. The glove could not have affected the verdicts, especially in light of the other evidence against the defendant. See *Commonwealth* v. *Perez*, 411 Mass. 249, 260-261 (1991); *Commonwealth* v. *Barnes*, 40 Mass. App. Ct. 666, 668 (1996). We thus conclude that, even if the warrant was not valid, the error was harmless beyond a reasonable doubt. *Perez, supra*; *Barnes, supra.*

Because we have concluded that the search warrants in question were valid, and that any evidence that may have been improperly seized and introduced at the defendant's trial constituted error that was harmless beyond a reasonable doubt, there is thus no reversible error with respect to the warrants.

2. *Severance.* The defendant filed a pretrial motion to sever the trials of the two sets of indictments. The motion was denied. The defendant now argues that joinder was improper because the offenses in the two sets of indictments were not related and the failure to sever was highly prejudicial to him.

Rule 9 (a) (3) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 859 (1979), provides that, where offenses are related, "[t]he trial judge shall join the charges for trial unless he determines that joinder is not in the best interests of justice." Joinder is a matter "committed to the sound discretion of the trial judge." *Commonwealth* v. *Delaney*, 425 Mass. 587, 593 (1997), cert. denied, 118 S. Ct. 714 (1998), quoting *Commonwealth* v. *Montanez*, 410 Mass. 290, 303 (1991). See *Commonwealth* v. *Hoppin*, 387 Mass. 25, 32 (1982). The defendant bears the burden of showing that joinder was improper. See *Delaney, supra* at 593-594; *Commonwealth* v. *Gallison*, 383 Mass. 659, 671 (1981).

The defendant argues that the offenses were not related because they involved different times, locations, weapons, victims, and motivations. Under Mass. R. Crim. P. 9 (a) (1), 378 Mass. 859 (1979), offenses are related if they "arise out of a course of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan." Factors such as time and location play an important role in determining whether offenses are related. See *Delaney, supra* at 594. However, our cases have allowed considerable differences with respect to these factors and other factual circumstances. See *id.* (joinder proper where multiple offenses occurred in dif-

ferent locations over period of three months); *Commonwealth* v. *Mamay*, 407 Mass. 412, 416-417 (1990) (same where offenses involved six different victims and other factual differences over period of eight months).

In the factually similar case of *Commonwealth* v. *Todd*, 394 Mass. 791, 794 (1985), the defendant argued that his indictment for murder in the first degree should have been severed from three other indictments stemming from his arrest at a different location some four hours after the murder occurred. We concluded that it was not an abuse of the trial judge's discretion to join the indictments.[5] *Id.* at 794-795. We similarly conclude here that it was not an abuse of discretion for the judge to determine that the defendant's offenses were related. Under the facts of this case, the alleged assault of Zaborski on June 11 (which was the basis for the warrant issued for the defendant's arrest), the murders, and the charges resulting from the defendant's arrest easily can be seen as the result of a single line of conduct growing out of one transaction, namely the defendant's response to the alleged rape of his wife. See *Commonwealth* v. *Blow*, 362 Mass. 196, 201 (1972).

The defendant also argues that the failure to sever the indictments was highly prejudicial to him, and thus not in the best interests of justice, because it impermissibly portrayed him as having a general propensity for crime, and because he wanted to testify regarding the indictments for murder, but did not want to testify regarding the indictments for assault.

The question whether the failure to sever the indictments resulted in undue prejudice must be decided "in the context of the guarantee of a fair trial for every defendant." *Commonwealth* v. *Sylvester*, 388 Mass. 749, 758 (1983). The question turns, in large measure, on whether evidence of the defendant's other offenses would have been admissible at a separate trial on each set of indictments. See *Mamay, supra* at 417, citing *Gallison, supra* at 672. However, this is not dispositive. See *Sylvester, supra* at 757-758. Nonetheless, a defendant must show that any prejudice resulting from a joint trial is so compelling that it prevented him from obtaining a fair trial. See *Delaney, supra* at 595, and cases cited. It is not enough for the defendant to show

---

[5]Although the defendant in *Commonwealth* v. *Todd*, 394 Mass. 791, 794 (1985), argued only that his indictments should have been severed because joinder was unduly prejudicial, our holding that joinder was proper contains a necessary inference that the indictments were related.

merely that his chances for acquittal would have been better had the indictments been tried separately. See *Delaney, supra,* and cases cited. Nor is it enough for the defendant simply to claim that he wanted to testify regarding some charges, but not others. See *Commonwealth* v. *Baran,* 21 Mass. App. Ct. 989 (1986).

Here, evidence of the defendant's standoff with the police would have been admissible in a separate murder trial, because it would have strongly implied consciousness of guilt, especially in light of the incriminating statements the defendant made at that time. See *Todd, supra* at 794-795; *Commonwealth* v. *Jackson,* 391 Mass. 749, 758 (1984). Further, the defendant, by his own admission, would have testified at a separate murder trial and he has not indicated how (if at all) his testimony would have been different from that which he actually gave. The defendant has thus failed to show any prejudice, much less a compelling prejudice, with respect to the murder indictments.

Similarly, the defendant's testimony at his murder trial would have been admissible in a separate assault trial. See P.J. Liacos, Massachusetts Evidence § 8.8.1, at 462-463 (6th ed. 1994). Additional evidence from the murder trial would have been admissible to the extent necessary to allow the prosecution "to present as full a picture as possible of the events surrounding the incident itself." *Commonwealth* v. *Marrero, ante* 65, 67 (1998), quoting *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 269-270 (1982). See *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 816 (1973). There was substantial evidence to support the verdicts on the assault indictments. See *Montanez, supra* at 304. Further, the judge instructed the jury to consider each of the charges against the defendant separately, and there is no indication in the record that this instruction was inadequate to offset any possible prejudice from the joinder, or that the jury inappropriately applied evidence of one indictment toward another. *Id.* The defendant has failed to show compelling prejudice with respect to the assault indictments.

Because we have concluded that the defendant has not met his burden of showing that the indictments were unrelated or that the failure to sever was highly prejudicial to him, there was thus no abuse of the judge's discretion with respect to joinder of the indictments.

3. *Admissibility of hearsay evidence.* The defendant argues that the judge erroneously allowed a number of hearsay state-

ments to be admitted. The defendant objected to the admission of each statement. Accordingly, we must consider if any of the statements was improperly admitted and, if so, whether the error caused prejudice to the defendant, requiring a new trial. See *Commonwealth* v. *Andrade*, 422 Mass. 236, 239 (1996); *Commonwealth* v. *Schulze*, 389 Mass. 735, 741 (1983).

The judge allowed Linehan to testify that Zaborski had told him three days before the murders that the defendant was constantly harassing Zaborski, that the defendant had gone to Zaborski's place of employment and punched him in the mouth, that Zaborski was afraid of the defendant, and that Zaborski "couldn't handle" the defendant. The judge admitted the testimony for the purpose of showing the victim's state of mind only and gave a limiting instruction.[6] The defendant correctly argues (and the Commonwealth concedes) that our recent rulings in a series of cases establish Linehan's testimony as improperly admitted hearsay. See *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 510-511 (1997); *Commonwealth* v. *Qualls*, 425 Mass. 163, 167 (1997); *Commonwealth* v. *Cyr*, 425 Mass. 89, 93-94 (1997).[7] In each of these cases, we reversed a conviction of murder in the first degree and ordered a new trial. The defendant argues that he should have the same result here. We disagree.

The improperly admitted hearsay did not prejudice the defendant because it was merely cumulative of properly admitted evidence of the defendant's hostility. See *Commonwealth* v. *Semedo*, 422 Mass. 716, 728 (1996); *Commonwealth* v. *Zagranski*, 408 Mass. 278, 284 (1990), citing *Commonwealth* v. *Lowe*, 391 Mass. 97, 106, cert. denied, 469 U.S. 840 (1984). Further, the defendant was not prejudiced in light of the other evidence of his guilt. See *Andrade*, *supra* at 239-242; *Zagranski*, *supra* at 283-284. The evidence against the defendant, though entirely circumstantial, was overwhelming, including the defendant's threats against the victims, his presence at the scene hours before the murders, his mysterious taxicab ride and disap-

---

[6]The judge also allowed similar testimony from another witness (Peter Smith). Our discussion and conclusion with respect to Linehan's testimony apply to Smith's testimony as well.

[7]Although these cases were decided after the defendant's trial, he is entitled to the full benefit of any changes in the law while his case is on direct review. See *Commonwealth* v. *Beauchamp*, 424 Mass. 682, 685 (1997), citing *Griffith* v. *Kentucky*, 479 U.S. 314, 320-328 (1987).

pearing duffel bag, his standoff with the police, his incriminating statements during his arrest, and the shell casing matching the murder weapon found in his home. Thus, the admission of Linehan's testimony, though improper, does not require reversal.

The judge also allowed testimony from a police officer who had responded to a telephone call from the defendant's wife, some three weeks prior to the murders, concerning a domestic incident. The officer was allowed to testify that he observed bruises on the face of the defendant's wife, that she was hysterical, and that she stated that the defendant had struck her and accused her of having an affair. The judge admitted the testimony as an excited utterance. The defendant argues that the officer's entire testimony should not have been admitted, on the basis of being either evidence of prior bad acts, irrelevant, or improper hearsay. We disagree.

Although "evidence of other criminal behavior may not be admitted to prove the propensity of the accused to commit the indicted offense . . . it is admissible for other relevant probative purposes." *Commonwealth* v. *Martino*, 412 Mass. 267, 280 (1992), quoting *Commonwealth* v. *Gallison*, 383 Mass. 659, 672 (1981). These other purposes include showing the defendant's motive or state of mind. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986); P.J. Liacos, Massachusetts Evidence § 4.4.7, at 158-160 (6th ed. 1994 & Supp. 1995). Here, the testimony concerning the defendant's wife established a motive for the killings, namely jealousy.

In addition, questions of relevancy "are entrusted to the trial judge's discretion and will not be disturbed except for palpable error." *Commonwealth* v. *Azar*, 32 Mass. App. Ct. 290, 300 (1992), quoting *Commonwealth* v. *LaSota*, 29 Mass. App. Ct. 15, 24 (1990). Evidence is relevant if it has any "rational tendency to prove an issue in the case." *Commonwealth* v. *Fayerweather*, 406 Mass. 78, 83 (1989), quoting *Commonwealth* v. *Chretien*, 383 Mass. 123, 136 (1981). The evidence need not prove the point at issue, so long as it "render[s] the desired inference more probable than it would have been without it." *Fayerweather, supra*, quoting *Commonwealth* v. *Copeland*, 375 Mass. 438, 443 (1978). Here, the statements of the defendant's wife rationally tended to demonstrate the origins of the defendant's motive to kill the victims, and were thus relevant. We note further that the judge gave a limiting instruction with respect to the officer's testimony and that the defendant has

never challenged the judge's conclusion that the statements were excited utterances. Accordingly, we conclude that the officer's testimony was properly admitted.

Finally, the judge allowed testimony from Curtis that he had remained at the corner observing the defendant for about two and one-half minutes because of Curtis's fear for the safety of the elderly woman who had been passing by. The defendant argues, without citation to any authority, that this testimony was an impermissible statement of the witness's subjective fear of the defendant. The defendant's argument has no merit. Curtis's testimony was clearly admissible to substantiate the reliability of his identification of the defendant and, in particular, to explain why he had remained at the intersection for an unusually long period of time. See *Commonwealth* v. *Cuffie*, 414 Mass. 632, 641 (1993), and cases cited (discussing factors for jury to consider in determining reliability of identification). The prejudicial effect, if any, of the testimony was minimal, because Curtis also testified that his concerns proved to be unwarranted. We thus conclude that Curtis's testimony was properly admitted.

Because we have concluded that the questioned testimony was either not admitted erroneously or, if admitted erroneously, was not prejudicial to the defendant, there is thus no reversible error with respect to this testimony.

4. *The prosecutor's closing statement.* The defendant argues that the prosecutor committed reversible error in his closing statement, because he appealed excessively to the jury's sympathy, vouched repeatedly for the Commonwealth's case, and argued facts not in evidence. On the defendant's objection, the judge indicated that the prosecutor's statement was "appropriate" and thus did not give any additional instructions at that time.

A prosecutor is entitled to argue forcefully for the defendant's conviction. See *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 (1987), citing *Commonwealth* v. *Earltop*, 372 Mass. 199, 205 (1977) (Hennessey, C.J., concurring). "[E]nthusiatic rhetoric, strong advocacy, and excusable hyperbole" are not grounds for reversal. *Commonwealth* v. *Sanna*, 424 Mass. 92, 107 (1997), quoting *Commonwealth* v. *Costa*, 414 Mass. 618, 628 (1993). The jury are presumed to have a certain measure of sophistication in sorting out excessive claims on both sides. See *Sanna*, *supra*, quoting *Kozec*, *supra* at 517.

The standard for determining whether a conviction must be reversed is whether the prosecutor's improper statements "constituted prejudicial error." *Commonwealth* v. *Santiago*, 425 Mass. 491, 500 (1997), *S.C.*, *ante* 298 (1998), quoting *Commonwealth* v. *Daggett*, 416 Mass. 347, 352 n.5. (1993). We consider the cumulative effects of all the errors in the context of the entire arguments and the case as a whole. See *Santiago*, *supra*, citing *Commonwealth* v. *Loguidice*, 420 Mass. 453, 454 (1995); *Commonwealth* v. *Smith*, 387 Mass. 900, 912 (1983). The factors that we will consider include:

> "whether defense counsel seasonably objected to the arguments at trial . . . whether the judge's instructions mitigated the error . . . whether the errors in the arguments went to the heart of the issues at trial or concerned collateral matters . . . whether the jury would be able to sort out the excessive claims made by the prosecutor . . . and whether the Commonwealth's case was so overwhelming that the errors did not prejudice the defendant" (citations omitted).

*Santiago, supra* at 500.

The defendant argues that the prosecutor improperly made excessive appeals to the jury's sympathy by emphasizing the gruesome nature of the crimes. Such appeals are improper because they may "sweep the jurors beyond a fair and calm consideration of the evidence." *Commonwealth* v. *Perry*, 245 Mass. 520, 531 (1926). However, the prosecutor's references to the gruesomeness of the crimes were not improper here, because the gruesomeness of the crimes and the suffering of the victims were relevant to the issue whether the defendant's actions constituted extreme atrocity or cruelty. See *Commonwealth* v. *Raymond*, 424 Mass. 382, 389-390 (1997). Also, the prosecutor did not gratuitously exploit or dwell on the gruesomeness, but made only a few passing references to it. By contrast, in *Santiago, supra* at 494, we concluded that the prosecutor acted improperly where he stated seven times that the victim of a fatal shooting (who was an innocent bystander) had been pregnant and four times that her birthday would have been the day after the shooting, as well as noting that closing arguments were coincidentally scheduled for the day that would have been her twentieth birthday.

The defendant further argues that the prosecutor improperly

vouched for the Commonwealth's case by telling the jury that they were in the "rare company" of a triple murderer, by attempting to link the defendant to other murderers in general, and by stating that the defendant had the "only motive in the world" to commit the murders. Improper vouching can occur if an attorney expresses a personal belief in the credibility of a witness, or indicates that he or she has knowledge independent of the evidence before the jury. See *Commonwealth* v. *Ciampa*, 406 Mass. 257, 265 (1989).

The prosecutor's references to the defendant as a triple murderer came close to constituting improper argument. However, the jury are presumed to know "that the prosecutor is an advocate" and to be able to recognize his arguments as advocacy and not statements of personal belief. *Commonwealth* v. *Coleman*, 366 Mass. 705, 714 (1975). We thus conclude that these references "did not cross the line between fair and improper argument." *Sanna, supra* at 107, 108 & n.19 (prosecutor's remark during closing statement that "defendant is responsible for this vicious act and no one else" not improper).

Similarly, the prosecutor did not improperly attempt to link the defendant to other murderers in general. The defendant's argument here is based on remarks by the prosecutor that were mere platitudes.[8] These remarks were far too trivial to imply that the prosecutor had special knowledge about murder cases in general, or about this case in particular, such that the jury should rely on his experience and not on the evidence. See *Commonwealth* v. *Storey*, 378 Mass. 312, 323-324 (1979), cert. denied, 446 U.S. 955 (1980).

In addition, the defendant insinuated that someone other than he might have had a motive to commit the murders, but there was no evidence that anyone other than the defendant actually had such a motive. We thus conclude that the prosecutor's remark concerning the defendant's being the only person with a motive was not improper, especially when considered in the light of the judge's clear instruction that the closing statement was not evidence. *Id.* at 324.

The defendant also argues that the prosecutor referred to

---

[8]For example, the prosecutor stated in his closing that "the common theme amongst murderers· is that they want to get away with it." He went on to say that "[m]ost murderers, including [the defendant], leave clues behind" and that it is "usually the little things that trip these guys up."

several facts not in evidence in his closing statement. First, the defendant argues that it was untrue that a witness (Curtis) identified the defendant's picture essentially "out of the blue," as the prosecutor contended in his closing statement, instead of in a suggestive manner. The defendant's argument here is incorrect. Curtis testified that he saw the defendant's picture in a newspaper about seventeen days after the murders were committed and that he then went to the police to report his story of having seen the defendant outside the victims' apartment building a few hours before they were murdered. Curtis also testified that he had identified the defendant spontaneously on seeing the picture alone, not based on the accompanying story. The prosecutor did not err here.

We are more troubled, however, by two other statements that the prosecutor made during his closing argument. The prosecutor stated, "We know surgical gloves were used in this murder." The defendant argues that there was insufficient evidence for the prosecutor to draw that conclusion. We agree. The only facts in evidence were that the fingertips from one surgical glove had been found at the scene, and that similar surgical gloves had been found nearby and at some of the sites that were searched pursuant to warrants. Contrary to the Commonwealth's argument, this is not enough to support a compelling inference that the murderer had used surgical gloves. In addition, the prosecutor stated that the murder weapon was "essentially" found in the defendant's hand, because a shell casing matching the murder weapon was found in the defendant's home. In fact, the guns used in the murder were never found. The Commonwealth's argument, that this was simply a "smoking gun" metaphor that could not confuse a reasonable jury, is unconvincing.

These two statements by the prosecutor constituted error and we must now decide if the error was prejudicial. For that determination, our answer depends heavily on the strength of the evidence against the defendant, which, as noted earlier, was overwhelming. Cf. *Santiago, supra* at 501; *Commonwealth* v. *Clary*, 388 Mass. 583, 591 (1983). Accordingly, we conclude that the prosecutor's error did not prejudice the defendant. If the evidence in this case had been closer, the possibility of a reversal would have been considerably stronger.

We thus conclude that nothing in the prosecutor's closing statement constituted reversible error.

5. *Jury instructions.* The defendant argues that the judge's instructions to the jury trivialized the concept of reasonable doubt, and correspondingly reduced the Commonwealth's burden of proof, by improperly referring to making decisions in everyday life, and by using an analogy of a jigsaw puzzle, in which it may be possible to draw a reasonable inference of what the whole picture is going to be, even if a certain number of pieces are missing.

The defendant did not object to the judge's reference to decision-making in everyday life. Our review is thus limited to whether there was a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Goudreau,* 422 Mass. 731, 735-736 (1996); *Commonwealth* v. *Giguere,* 420 Mass. 226, 232 (1995). In *Commonwealth* v. *Bonds,* 424 Mass. 698, 701 (1997), we determined that such a likelihood existed where the judge instructed the jury that reaching a verdict of guilty beyond a reasonable doubt was similar to the type of decision-making that jurors do in their everyday lives. However, in the instant case, the reference to making decisions in everyday life appears in the judge's instructions on drawing inferences from circumstantial evidence. Such instructions are closely related to the instructions on reasonable doubt, but they are not identical and we have upheld such instructions. See *Commonwealth* v. *Rosa,* 422 Mass. 18, 28 & n.11 (1996). There was no error in this instruction, much less a substantial likelihood of a miscarriage of justice.

The judge's analogy to a jigsaw puzzle is more problematic. The defendant objected to this part of the judge's instructions and our review is thus based on whether the instructions, if considered as a whole, might have misled a reasonable juror. See *Rosa, supra* at 27, citing *Commonwealth* v. *Torres,* 420 Mass. 479, 490-491 & n.10 (1995). In *Commonwealth* v. *Brooks,* 422 Mass. 574, 579 (1996), and in *Rosa, supra* at 25-29 & n.8, we were critical of similar instructions. However, in each of these cases, we held that the trial judge negated any possible confusion by otherwise properly reciting the classic reasonable doubt instruction from *Commonwealth* v. *Webster,* 5 Cush. 295, 320 (1850), including its caveat that even a strong probability of guilt is insufficient to satisfy the reasonable doubt standard. Here, the judge not only recited the *Webster* charge, but also gave an immediate supplemental instruction in response to the defendant's objection. In the supplemental instruction, the judge

noted that the puzzle analogy did not trivialize the Commonwealth's burden of proof. See *Goudreau, supra* at 735-736 (supplemental instruction curing erroneous instruction); *Giguere, supra* at 231-232 (same). We thus conclude that the judge's cure was sufficient, and that the instructions considered as a whole could not have misled a reasonable juror.

The defendant also argues that the judge committed reversible error by using the traditional "moral certainty" language in his *Webster* instruction. In the defendant's written request for jury instructions, he had asked the judge not to use this language and the defendant timely objected to the instruction. The defendant argues that the use of "moral certainty" is falling into disfavor, see *Victor* v. *Nebraska*, 511 U.S. 1, 16 (1994), and notes correctly that we have recently questioned the continued use of this language in our own cases. See *Commonwealth* v. *Bonds*, 424 Mass. 698, 702-703 (1997), and cases cited.

However, the defendant concedes that the use of "moral certainty" is, in and of itself, not error. Our cases have also upheld the use of that language, "if it is linked with language that lends content to the phrase." *Id.* at 703, quoting *Commonwealth* v. *Pinckney*, 419 Mass. 341, 345 (1995). See *Commonwealth* v. *Smith, ante* 245, 251-254 (1998). Here, the judge used "moral certainty" in the context of the traditional *Webster* instruction. This is sufficient. See *Commonwealth* v. *Latimore*, 423 Mass. 129, 140 (1996). We are not prepared to say, as the defendant appears to be asking us, that the use of "moral certainty" is per se incorrect. There was thus no error in the judge's use of this language.

We note further that the judge's "moral certainty" instruction contained one deviation from the traditional language, which defines "moral certainty" as "a degree of certainty that satisfies the judgment and consciences of a jury as reasonable men and women and leaves in their minds the clear, *settled* conviction of guilt" (emphasis added). See, e.g., *Commonwealth* v. *Gagliardi*, 418 Mass. 562, 568 n.3 (1994), cert. denied, 513 U.S. 1091 (1995). The judge's instruction here changed this final phrase to "the clear, *subtle* conviction of guilt." The defendant did not bring this difference to the attention of the judge, nor did the defendant argue it in his brief. Accordingly, we shall consider only whether this error created a substantial likelihood of a miscarriage of justice. See *Goudreau, supra* at 736; *Giguere, supra* at 232.

There is no such likelihood. A single incorrect word in an otherwise thorough instruction could not have confused a reasonable jury. See *Commonwealth* v. *Gunter, ante* 259 (1998); *Commonwealth* v. *Keniston,* 423 Mass. 304, 315-317 (1996); *Commonwealth* v. *Grant,* 418 Mass. 76, 84-85 (1994). The risk of confusion is especially slight where, as here, the incorrect word did not contradict other instructions, but merely made the phrase in which it occurred nonsensical. See, e.g., *Gunter, supra*; *Keniston, supra* at 317; *Grant, supra.* There is no reversible error here.

6. *Polling of jurors.* The defendant requested that the jurors be polled after the verdicts were delivered. The judge denied the request, which the defendant claims was error. The decision to poll the jurors is within the trial judge's discretion. See *Commonwealth* v. *Dias,* 419 Mass. 698, 700-701 (1995), citing Mass. R. Crim. P. 27 (d), 378 Mass. 897 (1979). We have concluded that "the better practice is to obtain 'a clear sign of each juror's assent to the announced verdict, by polling the jurors or otherwise.' " *Commonwealth* v. *Lawson,* 425 Mass. 528, 532 (1997), quoting *Dias, supra* at 703. However, we have never required the judge to poll the jurors unless there is specific evidence that the verdicts are not unanimous. See *Lawson, supra* at 530-532; *Dias, supra* at 700-701. Absent such evidence, the judge may properly deny an explicit request by the defendant for a poll. See *Dias, supra.* The defendant has pointed to no evidence on the record indicating a lack of unanimity. The jury returned the verdicts in open court. See Mass. R. Crim. P. 27 (a), 378 Mass. 897 (1979). The foreperson affirmed the verdicts as read by the clerk. See *Lawson, supra* at 530-532; *Lawrence* v. *Stearns,* 11 Pick. 501, 502 (1831). The process here was thus legally sufficient and there was no error.

7. *Review under G. L. c. 278, § 33E.* The defendant argues that even if individual errors in his trial were not substantial enough to warrant reversal, the combination of errors indicates that a new trial is required. We disagree. The defendant's convictions, in our opinion, are supported by overwhelming evidence. We have reviewed the entire record on both the law and the facts, see G. L. c. 278, § 33E, and see no basis for granting relief of any kind.

*Judgments affirmed.*