NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11675

COMMONWEALTH  vs.  KYLE BRYANT.


Plymouth.     May 10, 2019. - July 30, 2019.

Present:  Gants, C.J., Gaziano, Lowy, Budd, & Cypher, JJ.


Homicide.  Evidence, Prior misconduct, Inflammatory evidence,
    Identification.  Identification.  Practice, Criminal,
    Instructions to jury, Mistrial, Capital case.



Indictments found and returned in the Superior Court
Department on April 5, 2010.

The cases were tried before Thomas F. McGuire, Jr., J.


Alan J. Black for the defendant.
Audrey Anderson, Assistant District Attorney, for the
Commonwealth.


CYPHER, J.  A jury convicted the defendant, Kyle Bryant, of

murder in the first degree on a theory of deliberate

premeditation for the killing of Darnell Harrison (victim).[1]  On

---

[1] The defendant also was convicted of unlawful possession of
a firearm and found not guilty of armed assault with intent to
murder Sean Cox.

appeal, the defendant contends that the judge erred when he allowed the Commonwealth to introduce prior bad act evidence that showed the defendant was a drug dealer, denied the defendant's request for an eyewitness identification jury instruction, and denied the defendant's motion for a mistrial.

For the reasons stated below, we affirm the defendant's convictions. After a thorough review of the record, we also decline to exercise our authority under G. L. c. 278, § 33E, to grant a new trial or to reduce or set aside the verdict of murder in the first degree.

1. Background. We summarize the facts that the jury could have found, reserving pertinent facts for the discussion of the defendant's arguments.

The defendant was a drug dealer who, along with his associates, Peterson Fleury and Tremaine Hampton, sold drugs from a bar. Approximately two months prior to the killing, Fleury sold $1,200 of the defendant's drugs to Sean Cox and was given $1,100 in counterfeit money.[2] The defendant was angry that

---

[2] The Commonwealth's theory at trial, presented during their opening statement, was that Cox purchased the defendant's drugs from Peterson Fleury with counterfeit money. The Commonwealth attempted to introduce this evidence through the testimony of Tremaine Hampton, Cox, Fleury, and a bartender at the bar, Robert Mantell. However, Hampton's testimony was struck because it was hearsay, Cox denied he ever purchased or sold narcotics, Fleury denied any transaction involving counterfeit money with Cox, and the judge did not permit Mantell to testify to the identity of the individual who used counterfeit money. Although

he had been deceived. He told Hampton that he was "gonna get" the person who stole from him.

On January 5, 2010, the victim and Cox were at the bar. Fleury, who frequented the bar, briefly talked to the victim and Cox and then telephoned the defendant eight times between 5:36 P.M. and 6:07 P.M. Fleury told the defendant that Cox and the victim were at the bar.

At approximately 6 P.M., the victim and Cox left through the rear of the bar to smoke a cigarette. Shortly thereafter, an individual in a dark, hooded sweatshirt approached Cox and the victim and shot them. The victim stumbled back into the bar and collapsed. After Fleury saw the victim lying on the floor of the bar, he telephoned the defendant again. Cox survived the shooting, but the victim did not.

Minutes after the shooting, the defendant arrived at the home of Pamela Brown, who lived in an apartment behind the bar and had purchased drugs from the defendant in the past. The defendant banged on her door. Brown thought that strange because the defendant always telephoned her before arriving at

---

the Commonwealth did not mention Cox as the individual who used counterfeit money in its closing argument, defense counsel did. In his brief, the defendant also acknowledged and argued against the Commonwealth's original theory. Furthermore, at oral argument the defendant conceded that there was sufficient evidence presented at trial that Cox was the individual who used counterfeit money to purchase the defendant's drugs.

her apartment, but he did not do so that day.  Once inside, the defendant ran to the bathroom, where he rinsed off his sweatshirt and hung it on the door.  Later, he placed the sweatshirt in a plastic bag.  The defendant then telephoned Hampton and instructed him to go to the bar to see if police had arrived, but Hampton did not go.

Soon after the shooting, the defendant's girlfriend arrived at Brown's apartment.  The defendant put the plastic bag holding his sweatshirt in his girlfriend's vehicle and placed an unidentified object under the passenger's side seat.  The defendant's girlfriend drove away.

Hours later, Hampton and the defendant met in person, where the defendant confessed to being the shooter.  The defendant repeatedly asked Hampton, "Can I trust you?"  The defendant stated:  "[The victim] couldn't make it to the door in time.  I shot him and then I shot him again."

A few weeks later, the defendant again confessed to Hampton about the killing.  He said that "if he knew killing was this easy, he would have been doing it" and "[i]t was just like taking candy from a baby."  The defendant also bragged that police would never find his cellular telephone or the gun he used in the killing because he had buried them.

Police recovered three spent nine millimeter shell casings outside the rear of the bar, two spent nine millimeter bullets

from inside Cox, and another two nine millimeter bullets from the door of the bar and inside the bar. The defendant owned two nine millimeter guns. One of the defendant's guns was chrome colored. A witness at the scene described the gun used in the shooting as being silver. The witness also described the shooter as matching the defendant's general characteristics -- height and complexion -- and testified that he was wearing a dark, hooded sweatshirt. Multiple other witnesses testified that they saw a man who matched the defendant's characteristics, and who was wearing dark clothes and a hooded sweatshirt, running from the area of the bar toward the area of Brown's house shortly after the shooting.

A home recording surveillance system close to the bar captured video footage of a man walking through the area immediately after the shooting. Still photographs from that video footage were included in evidence, and both Brown and Hampton identified the man in the photographs as being the defendant.

2. Discussion. a. Prior bad acts. Before trial, the Commonwealth filed a motion in limine to allow testimony by Hampton and two prior drug customers of the defendant, Scott Rounds and Elayne Mahoney. The Commonwealth sought to admit evidence of the defendant's drug distribution both before and after the shooting as probative evidence of the defendant's

motive to shoot Cox and the victim and as probative evidence of his demeanor and state of mind on the night of the killing. The defendant opposed the admission of this testimony, arguing that it was bad character evidence and that it was more prejudicial than probative. The judge allowed the admission of the testimony. At trial, the Commonwealth presented evidence from Hampton, Rounds, and Mahoney that showed that the defendant was a drug dealer.

The defendant argues that this evidence was admitted improperly because it showed that the defendant had a criminal propensity or was of bad character. He further contends that, even if any of the evidence was potentially relevant, the evidence was more prejudicial than probative, and therefore it should not have been admitted. The Commonwealth argues that the evidence was offered for the purposes of establishing the defendant's motive as well as his state of mind on the night in question. We conclude that the judge did not abuse his discretion in admitting the evidence.

"It is well settled that the prosecution may not introduce evidence that a defendant previously has misbehaved, indictably or not, for the purposes of showing his bad character or propensity to commit the crime charged, but such evidence may be admissible if relevant for some other purpose." Commonwealth v. Helfant, 398 Mass. 214, 224 (1986). See Mass. G. Evid. § 404(b)

(2019).  Such evidence may be admissible to show, for example, "a common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive."  Helfant, supra.  "It also may be used where evidence of the prior bad acts is inextricably intertwined with the description of events . . . of the killing" (quotation and citation omitted).  Commonwealth v. Marrero, 427 Mass. 65, 67 (1998).

Nevertheless, even if the evidence is relevant to one of these other purposes, the evidence will not be admitted if its probative value is outweighed by the risk of unfair prejudice to the defendant.  Commonwealth v. Crayton, 470 Mass. 228, 249 (2014).  See Mass. G. Evid. §§ 403, 404(b)(2).  "Determinations of the relevance, probative value, and prejudice of such evidence are left to the sound discretion of the judge, whose decision to admit such evidence will be upheld absent clear error" (citation omitted).  Commonwealth v. Dung Van Tran, 463 Mass. 8, 14-15 (2012).  The effectiveness of limiting instructions in minimizing the risk of unfair prejudice should be considered in balancing prejudice and probative value.  See Commonwealth v. Dunn, 407 Mass. 798, 807 (1990); Mass. G. Evid. §§ 105, 403.

i.  Hampton.  At trial, Hampton testified that he had been a friend of the defendant for approximately three years prior to the killing.  Shortly after meeting the defendant, Hampton began

selling drugs for him.  Hampton testified that, a few months before the shooting, the defendant told him that someone used counterfeit money to steal the defendant's drugs from Fleury. The defendant told Hampton that he was going to "handle it" when he saw the person who stole the drugs.

The evidence of the defendant's activity as a drug dealer was highly probative and relevant because it established his relationship with Hampton as a friend and drug dealing associate, which explained why the defendant would confide in Hampton and established a motive for the shooting.  See Commonwealth v. Copney, 468 Mass. 405, 414 (2014).  The Commonwealth's theory of the case was that Cox stole $1,100 worth of drugs from the defendant.  One of the defense strategies was to point to another drug dealer who sometimes worked with the defendant, Andrew Levy, as the perpetrator of the killing.  "In these circumstances, it was unavoidable that evidence of the defendant's drug business and his interactions with his customers would be admitted."  Marrero, 427 Mass. at 68.

Moreover, the defendant's statement that he would "handle it" indicates the defendant's intent to get revenge for the theft.  See Commonwealth v. Almeida, 479 Mass. 562, 568 (2018). This evidence was also essential to the Commonwealth's case to establish premeditation.  See Commonwealth v. Pagan, 440 Mass.

84, 87-88 (2003) (prior bad act evidence admissible to show hostile nature toward victim and premeditation of subsequent killing); Marrero, 427 Mass. at 68 (evidence of involvement in drug dealing business admissible where relevant to motive for killing). Without the evidence that the defendant was a drug dealer who sought revenge, "the killing could have appeared to the jury as an essentially inexplicable act of violence." Commonwealth v Bradshaw, 385 Mass. 244, 269 (1982). The Commonwealth is permitted to present a full picture of the events surrounding the crime, and the prejudice likely to be generated by the admission of this evidence did not outweigh its substantial probative value. See id. at 269-270. There was no error.

ii. Mahoney. Mahoney testified that she bought drugs from the defendant "[s]ometimes daily, sometimes three or four times a week" for approximately ten months leading up to the night of the killing. She claimed that the defendant was always a "nice guy," "easy going," "very polite," and punctual. However, on the night of the shooting the defendant acted differently from his usual manner. Mahoney testified that the defendant was late to the drug deal, was "anxious," and "wanted to get [the drug deal] done and get out of there." The defendant told Mahoney that "some shit just went down" and then, after completing the drug deal, told her to "take your shit and go." Mahoney also

testified that it was "[r]eal cold" that night and the defendant only was wearing a T-shirt.

Mahoney's testimony was relevant and probative because it showed the defendant's state of mind in the immediate aftermath of the killing. See Commonwealth v. Wilson, 427 Mass. 336, 349 (1998) (evidence that shows defendant's state of mind is probative). The defendant typically was "very polite" and "easy-going." Yet, after the killing, he was anxious and rude. The probative value of the defendant's state of mind in the immediate moments following the killing is not outweighed by cumulative evidence of his low-level drug dealing. See Commonwealth v. Rutherford, 476 Mass. 639, 649 (2017); Commonwealth v. Philbrook, 475 Mass. 20, 26-27 (2016).

iii. Rounds. Rounds testified that he had been a customer of the defendant for three or four years. He claimed that the defendant had paid his bail when he was incarcerated and that he had been incrementally paying the defendant back. He testified that on the night of the shooting he telephoned the defendant four or five times to pay the defendant the money he owed. Typically, the defendant answered when Rounds telephoned him, but on that night, he did not answer his telephone immediately. When the defendant finally answered Rounds's telephone call, he abruptly ended it.

Although Rounds's testimony mostly was cumulative, it showed that the defendant was in a hurry on the night of the killing and not his usual self. The judge did not abuse his discretion in admitting it. This evidence was relevant to the defendant's state of mind on the night of the killing, and its probative value and cumulative nature was not outweighed by its potential prejudice to the defendant. See Wilson, 427 Mass. at 349.

In any event, the judge took appropriate steps to minimize the impact of the evidence that the defendant was a drug dealer. See Commonwealth v. Forte, 469 Mass. 469, 480-481 (2014) (no error in admission of prior bad act evidence where, among other things, jury instructions minimized potential for prejudicial effect); Commonwealth v. Donahue, 430 Mass. 710, 718 (2000) (proper jury instructions can render potentially prejudicial evidence harmless); Mass. G. Evid. § 105. During the final jury charge, the judge instructed that they could consider the evidence of the defendant's prior drug dealing "solely on the limited issue of motive and as an explanation of the relationships between various other individuals and the defendant."[3] The jury were instructed not to use the evidence

---

[3] The complete instruction stated:

"Now, you heard evidence in the case that the defendant engaged in illegal drug dealing. The defendant is not

that the defendant was a drug dealer to conclude that he also must be guilty of the crimes charged.  We presume that the jury followed the judge's instructions.  See Crayton, 470 Mass. at 251.  Cf. Commonwealth v. Gomes, 475 Mass. 775, 785 (2016) (where balance between prejudice and probative value was close, contemporaneous limiting instructions persuaded court that bad acts evidence was properly admitted).

Best practice would certainly have been to give a limiting instruction at the time the evidence of the defendant's drug dealing history was admitted.  See Commonwealth v. Facella, 478 Mass. 393, 402 (2017).  The timing of a limiting instruction is, however, ultimately in the discretion of the trial judge.  See Commonwealth v. Carter, 475 Mass. 512, 526 (2016), citing Mass.

charged with any drug offenses.  So you may not consider evidence of illegal drug dealing as a substitute for proof that the defendant committed the crimes that are charged. Nor may you consider it as proof that the defendant has a criminal personality or bad character.  You may consider such evidence solely on the limited issue of motive and as an explanation of the relationships between various other individuals and the defendant.  You should not consider that evidence for any other purpose.

"The issue for the jury to decide is whether the Commonwealth has proven beyond a reasonable doubt that the defendant committed the particular crimes with which he is charged; that is, the murder of Darnell Harrison, armed assault with intent to murder Sean Cox and unlawful possession of a firearm.  You may not use evidence that the defendant engaged in illegal drug dealing to conclude that he must also have committed the crimes with which he's now charged."

R. Crim. P. 24 (b), 378 Mass. 895 (1979) (judge has broad discretion as to timing of limiting instructions); Commonwealth v. Linton, 456 Mass. 534, 551 n.12 (2010) (although "we find it preferable that the limiting instruction be given the same day as the testimony at issue, we do not find that the delay materially diminished the impact of the limiting instruction on the jury"); Mass. R. Crim. P. 24 (b) (no limitation on timing of instructions).  Here, the defendant did not ask for a contemporaneous limiting instruction at trial.  See Commonwealth v. Leonardi, 413 Mass. 757, 764 (1992) ("the law does not require a judge to give limiting jury instructions regarding the purpose for which evidence is offered unless so requested by the defendant").  Furthermore, on appeal, the defendant takes no issue with the judge's instruction during the final jury charge. Regardless, because the question whether the evidence was more prejudicial than probative was not particularly close, we conclude that there was no substantial likelihood of a miscarriage of justice from the failure to give a limiting instruction at the time the bad act evidence was admitted.

b.  Identification instruction.  During the jury charge conference, the Commonwealth and the defendant requested instructions regarding the identification evidence that was admitted at trial.  The Commonwealth's requested instruction was based on the model jury instruction at the time of trial.  The

defendant sought an eyewitness instruction that aligned with the recent report of the Supreme Judicial Court Study Group on Eyewitness Evidence.  In response, the judge stated:  "[B]oth of [the requested] instructions . . . have to do with the subject of eyewitness identification.  And we don't have any eyewitness identification in this case.  We didn't have a witness who took the stand and said I saw the shooting."  Denying both the Commonwealth and the defendant's requested instructions, the judge formulated an instruction based on the type of identification that occurred in the case -- Brown and Hampton's identification of the defendant from the still images taken from security footage near the bar.  The defendant did not object to the instruction.

On appeal, the defendant argues that he was prejudiced by the judge's decision not to give the defendant's eyewitness instruction.  The Commonwealth argues that the judge did not abuse his discretion in denying the defendant's instruction because there was no eyewitness identification in the case.  We agree with the Commonwealth.

In Commonwealth v. Gomes, 470 Mass. 352, 379-388 (2015) (Appendix), S.C., 478 Mass. 1025 (2018), we formulated a new provisional eyewitness instruction to be given to the jury where there was incriminating eyewitness identification testimony

offered by a witness.[4]  Here, not only was this case tried before Gomes, see Commonwealth v. Bastaldo, 472 Mass. 16, 23 (2015) (provisional eyewitness instruction to be given in trials that commence after Gomes), but there was no eyewitness identification.  The Commonwealth entered evidence that Brown and Hampton, both of whom had an extensive relationship with the defendant, identified him from still images taken from a security camera near the bar.  There was no witness that directly identified the defendant as the assailant.  Other witnesses testified to generic details about the defendant's height, clothing, and race.  That testimony did not convey "details so specific to the defendant that they essentially serve as a partial eyewitness identification."  Commonwealth v. Johnson, 470 Mass. 389, 395 n.11 (2015).  Thus, because there was no identification testimony that incriminated the defendant, the judge did not abuse his discretion in declining to give the defendant's requested instruction.  Id. at 396-397.

---

[4] The provisional instruction in Gomes updated the instruction that was adopted in Commonwealth v. Rodriguez, 378 Mass. 296, 310–311 (1979) (Appendix), S.C., 378 Mass. 296 (1979), with principles relevant to the evaluation of eyewitness testimony for which there is at least a near consensus in the relevant scientific community.  Commonwealth v. Gomes, 470 Mass. 352, 376 (2015), S.C., 478 Mass. 1025 (2018).  We have since adopted the Model Jury Instructions on Eyewitness Identification, 473 Mass. 1051 (2015), to replace the provisional instruction in Gomes.

c. <u>Mistrial</u>. At trial, a State police trooper, Robert Klimas, testified on behalf of the Commonwealth. On the night of the killing, Klimas reviewed video surveillance footage taken inside and outside the bar. After conducting witness interviews, Klimas testified that there were six people outside the bar when the shooting occurred, "including the shooter." The prosecutor asked Klimas, "Who did you identify as being outside at the time?" In response, Klimas named the victim, Cox, several other witnesses, and the defendant. Defense counsel immediately moved for a mistrial. The judge denied the motion, but struck the identification testimony and gave a forceful curative instruction.

The defendant argues that the judge erred in denying the defendant's motion for a mistrial. We review the decision to deny a motion for a mistrial for an abuse of discretion. See <u>Commonwealth</u> v. <u>Bryant</u>, 447 Mass. 494, 503 (2006). Where a party seeks a mistrial in response to the jury's exposure to inadmissible evidence, the judge may correctly rely on curative instructions as an adequate means to correct any error and to remedy any prejudice to the defendant. <u>Id</u>., quoting <u>Commonwealth</u> v. <u>Kilburn</u>, 426 Mass. 31, 37-38 (1997).

We see no abuse of discretion in the judge's decision to deny the defendant's motion for a mistrial. Klimas's testimony, in which he identified the defendant as one of the six people

who were outside the bar at the time of the shooting, and indicated that one of the six was "the shooter," was improper. However, the judge immediately corrected the mistake by striking the testimony and giving a forceful curative instruction. See Kilburn, 426 Mass. at 38 (no abuse of discretion in denying request for mistrial where judge immediately instructed jury to disregard improper testimony and there was no reference to improperly admitted testimony later in trial); Commonwealth v. Chubbuck, 384 Mass. 746, 753 (1981) ("By striking the testimony and promptly instructing the jury to disregard it, the judge did all that was necessary to cure any possible error from the admission of the statement"). We presume that the jurors followed the judge's prompt and strongly worded instruction to disregard Klimas's identification. See Commonwealth v. Durand, 475 Mass. 657, 669 (2016), cert. denied, 138 S. Ct. 259 (2017).

Moreover, at the beginning of trial the judge instructed the jury that they were not to consider any testimony that he struck from the record. In addition, at the conclusion of trial, the judge instructed the jury on the specific identification evidence that was before them. The judge did not abuse his discretion in denying the motion for a mistrial.

3. Conclusion. We have reviewed the record in its entirety and see no basis to grant extraordinary relief under

G. L. c. 278, § 33E. For the above reasons, we affirm the defendant's convictions.

<u>So ordered</u>.