NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-12

LIDIANE A. ROCHA & another[1]

vs.

NILTON MEDINA & another.[2]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

On June 5, 2023, following a medical malpractice trial in the Superior Court, a jury returned verdicts in favor of the plaintiffs, Lidiane A. Rocha (Rocha) and her husband Marcizio Araujo, for claims of negligence and loss of consortium against defendant Nilton Medina (Dr. Medina).  The jury awarded damages against Dr. Medina but not Boston Medical Center (BMC), finding that BMC had no power over Dr. Medina's treatment decisions.  A judgment entered on June 6, 2023, and Dr. Medina now appeals, asserting that the judge below committed reversible error by (1) denying Dr. Medina's request for a new trial, and (2) failing to

_____

[1] Marcizio J. Araujo.

[2] Boston Medical Center.

properly instruct the jury as to factual or "but-for" causation. Dr. Medina also argues that the judgment must be vacated due to insufficient evidence as to the element of causation, and because the judgment was rendered by a Superior Court jury of less than twelve members.  We affirm.

Background.  We summarize the following relevant facts, while reserving further facts for discussion.

On February 11, 2015, Rocha underwent a bilateral breast reduction surgery performed by Dr. Medina at BMC.  The parties disputed whether Dr. Medina arrived late to the hospital on the morning of the surgery, since the surgery commenced over an hour after it was scheduled to begin.  When he arrived, Dr. Medina immediately began his preoperative markings, which Rocha testified that he completed in under five minutes.[3]  Dr. Medina did not use a tape to take any measurements or take photographs of the preoperative markings.  At trial, Mark Weinstein (Dr. Weinstein), an expert on plastic surgery retained by Rocha, testified that Dr. Medina failed to perform critical measurements and a corresponding visual assessment to determine the proper location of Rocha's nipples, and breached the

---

[3] Preoperative markings identify the surgical site and help the surgical team perform incisions.

2

standard of care by ultimately placing Rocha's nipples too high on her breasts.

In the days following the surgery, Rocha noticed that her nipples were unusually high, and were protruding from the top of her bra. In February, March, and May of 2015, Rocha returned to the BMC with complaints of her nipples being too high. She was told that it was still early, and that once the swelling went down her nipples would fall into place. After several months of waiting for the healing process to lower her nipples without much change, Dr. Medina agreed to perform a second procedure to surgically lower the nipples. Dr. Medina performed this surgery free of charge and offered Rocha free liposuction of her abdomen and back. The second surgery was unsuccessful in lowering the nipples and resulted in scarring that was not present after the first surgery. During her direct examination at trial, Rocha testified that during a postoperative visit with Dr. Medina following the second surgery, Dr. Medina assured her that he would fix her high nipples. Rocha further testified that Dr. Medina approached her and hugged her while she was dressed only in her underwear, and that he told Rocha "not to worry because [she] was going to look really good, and it was just the process." Dr. Medina's trial counsel did not contemporaneously object to the admission of this testimony but did object at a

3

subsequent lunch break and requested a mistrial for its admission.[4]  The request was grounded on relevance, lack of notice regarding the doctor's alleged conduct, and the potential prejudice arising from the testimony.  The judge heard from both parties' trial counsel, and after a lengthy sidebar discussion concluded that the doctor was provided adequate notice regarding his alleged behavior, albeit "not as much notice as [the judge] would have liked," and denied the motion.  The judge also concluded, however, that a curative instruction to the jury was warranted and provided one thereafter.

Discussion.  1.  Motion for new trial.  Dr. Medina argues that the trial judge committed reversible error by failing to grant his motion for a new trial.  His motion was primarily premised on the admission of Rocha's testimony regarding the alleged hug, as well as the trial judge's curative instruction regarding that testimony and the judge's failure to strike the testimony sua sponte or grant a mistrial.  These arguments are unavailing.

We review the denial of a motion for a new trial "for a significant error of law or abuse of discretion."  Commonwealth

_____

[4] Dr. Medina's counsel did object earlier in the trial when Dr. Medina was asked by Rocha's counsel during cross-examination whether he ever recalled hugging Rocha while she was alone in his office and "was dressed not at all."  However, the basis for the objection is not apparent on the record.

4

v. Sanchez, 100 Mass. App. Ct. 644, 647 (2022). "[A] new trial should be granted only when on a survey of the whole case it appears to the judge that otherwise a miscarriage of justice would result" (quotation and citation omitted). Fitzpatrick v. Wendy's Old Fashioned Hamburgers of N.Y., Inc., 487 Mass. 507, 514 (2021).

A request for a mistrial is "an immediate, on-the-spot response to a specific issue so serious that it warrants breaking off a trial that has begun, and may be close to concluding." Fitzpatrick, 487 Mass. at 513. Therefore, "[i]n both civil and criminal cases, a motion for a mistrial must be made immediately after the events prompting the motion occur, or as soon as the moving party learns of them." Id., citing Commonwealth v. DiPietro, 373 Mass. 369, 387 (1977). "[A] mistrial is generally regarded as the most drastic remedy and should be reserved for the most grievous error where prejudice cannot otherwise be removed" (quotations and citation omitted). Fitzpatrick, supra. We review the denial of a motion for a mistrial for an abuse of discretion. See Commonwealth v. Bryant, 482 Mass. 731, 739 (2019).

Here, it is undisputed that Dr. Medina's trial counsel did not contemporaneously object to Rocha's testimony about the alleged hug, and instead chose to address the issue with the

5

trial judge some two hours later at a sidebar conference during the lunch break, which is also when she first requested a mistrial.  Because Dr. Medina's motion for a mistrial was untimely and therefore unpreserved, we review to determine whether the trial judge's denial of the mistrial created a substantial risk of a miscarriage of justice.  See Fitzpatrick, 487 Mass. at 513.  In concluding that a substantial risk of a miscarriage of justice did not result, we are confident that the trial judge's curative instruction appropriately dealt with the prejudice stemming from Rocha's testimony.  The curative instruction informed the jurors:[5]

> "During this trial, you may hear testimony about an interaction between the plaintiff, Ms. Rocha, and the defendant, Dr. Medina, involving a hug.  You may or may not find this evidence relevant to the issues in this case.  If you don't find it relevant, you are to disregard it.  If you do find it relevant, you are to consider why it is relevant and then consider it for that limited purpose or purposes only.  This is not being offered to show bad character on the part of Dr. Medina and you should not consider it as such.  So it is your -- it is totally within your province to decide is this evidence relevant?  If it's not, disregard it.  If you find that it is relevant, you need to decide why and then apply it solely for that limited purpose of why you think it's relevant."

Dr. Medina contends that this curative instruction was "an improper delegation of judicial function" because instructing the jury to determine whether the testimony was relevant "did

---

[5] The trial judge assumed that all parties objected to the curative instruction and noted their objections on the record.

nothing to alleviate the harm . . . [but instead] left [the testimony] for the jury to use . . . for any purpose [they] wished."  Contrary to this contention, the instruction mandated Rocha's testimony should not be considered "to show bad character on the part of Dr. Medina," and should only be considered to the extent the jury finds it relevant to a particular issue in the case.  Indeed, it was well within the judge's discretion to use a curative instruction to "correct any error and to remedy any prejudice to the defendant" (citation omitted), Commonwealth v. Costa, 69 Mass. App. Ct. 823, 827 (2007), and we disagree that the instruction failed to do so here.[6]  Likewise, given this curative instruction we also conclude that the trial judge's failure to strike Rocha's testimony sua sponte did not create a substantial risk of a miscarriage of justice.[7]  Accordingly, we see no abuse of

---

[6] We also note that although Dr. Medina's trial counsel asserted both at trial and in his motion for a new trial that Dr. Medina was not provided with notice of Rocha's testimony, Dr. Medina was, in fact, asked about the alleged hug during his October 2019 deposition.

[7] Dr. Medina's trial counsel did not move to strike Rocha's testimony.

7

discretion in the judge's denial of Dr. Medina's motion for a new trial.  Sanchez, 100 Mass. App. Ct. at 647.[8]

2.  Causation arguments.  Dr. Medina sets forth two arguments on appeal relating to causation.  First, he argues that the trial judge, by using the Superior Court model jury instructions, failed to adequately instruct the jury on factual or "but-for" causation in contravention of the Supreme Judicial Court's decision in Doull v. Foster, 487 Mass. 1, 6 (2021).  Second, Dr. Medina contends that the evidence presented at trial was insufficient for a jury to find that Dr. Medina's negligence caused Rocha's high nipples.  We disagree.

a.  Jury instructions.  Dr. Medina argues that the trial judge's use of the model jury instructions did not comply with Doull because the model instructions diluted the "but-for" standard of causation by stating that causation can be found if a defendant's negligence "make[s] a difference," "ha[s] an

---

[8] Dr. Medina also identifies the following "erroneous rulings" that trial counsel did object to:  (1) the trial judge's allowance of the impeachment of Dr. Medina when he testified about textbooks and literature that were not disclosed in his pretrial interrogatories; (2) the use of medical records of other patients treated by Dr. Medina; (3) the admission of a weather report on the day of the first surgery; and (4) the admission of a picture of Rocha measuring the distance from her sternal notch to her nipple.  However, we conclude that none of these rulings amounted to an abuse of discretion or error of law.  See Antoniadis v. Basnight, 99 Mass. App. Ct. 172, 176 (2021), citing Zucco v. Kane, 439 Mass. 503, 507 (2003).

8

impact," or "was a factor in causing" a plaintiff's injuries. The Supreme Judicial Court's recent decision in Luppold v. Hanlon, 495 Mass. 148, 160 (2025), rejected this argument and is instructive. In Luppold, supra, the court upheld a trial judge's use of the model instruction on causation, stating that "the instructions as a whole . . . conveyed a 'but-for' causation requirement as explained in Doull."[9] The court further noted that "the inclusion of the word 'impact' tracks language we used in Doull [which stated] 'the purpose of [the] but-for standard is to separate the conduct that had no impact on the harm from the conduct that caused the harm." Luppold, supra at 161, quoting Doull, 487 Mass. at 11. Accordingly, we find no error in the trial judge's causation instruction.

b. _Causation evidence_. Dr. Medina asserts that there was insufficient evidence on the issue of causation because Rocha's expert, Dr. Weinstein, did not opine that Dr. Medina caused Rocha's injuries. Specifically, Dr. Medina asserts that Dr. Weinstein did not testify that Dr. Medina's failure to perform measurements resulted in Rocha's high nipples, and that Dr. Weinstein erroneously stated that "bottoming out" was not an

_____

[9] As was the case here, the jury instruction used by the trial judge in Luppold, 495 Mass. at 159, "largely tracked that of the Superior Court's model jury instruction on causation."

9

inherent risk of a breast reduction procedure.[10]  He also argues
that Dr. Weinstein improperly testified that Dr. Medina's
failure to perform two additional preoperative measurements fell
below the standard of care.  To be sure, Dr. Medina is correct
that a causal link between a defendant's negligence and
plaintiff's injuries generally must be established by expert
testimony, Harlow v. Chin, 405 Mass. 697, 702 (1989).  Here,
however, Dr. Medina's arguments misinterpret Dr. Weinstein's
testimony.

At trial, Rocha's theory was that Dr. Medina was negligent
by placing her nipples too high during her breast reduction
surgery.  To prove this theory, Rocha sought expert testimony
from Dr. Weinstein who opined that Dr. Medina failed to take the
proper measurements, such as measurements from the sternal notch
and the mid humerus, which was a failure to meet the standard of
care that resulted in Dr. Medina placing Rocha's nipples too
high on her chest during surgery, causing her to have high
nipples.[11]  His exact testimony was as follows:

---

[10] Bottoming out is a phenomenon that can occur during the
healing process following certain breast procedures when breast
tissue drops to the lower pole of the breast.  However, the
parties disputed throughout trial whether bottoming out can lead
to high nipples.

[11] The sternal notch is an indentation in the upper part of
the sternum located between the clavicles and at the base of the
neck.

10

Q.: "Okay. What's this line depicted on the screen?"

A.: "Using the mid humerus is one way to determine where the nipple should be. You have to view all of these things in terms of using each measurement or visualization in determining where the nipple should be. It's not just one. It's a total picture of all of these criteria to measure where the nipples should be . . . [i]f we use [the sternal notch measurement] plus the humerus plus the Inframammary Fold, you always determine where the nipple should be."

Q.: "And is that a reliable method of determining the proper location?"

A.: "Yes, that's really [the] standard of care in determining where the nipple should be."

Q.: "Okay. And does the standard of care require that a physician take those measurements?"

A.: "Yes, it does."

Q.: "And in your review of the medical literature in this case regarding Dr. Medina's surgery, did he utilize these measurements?"

A.: "I did not see any documentation that he utilized them."

Q.: "Okay. And based on that, do you form an opinion to a reasonable degree of medical certainty whether Dr. Medina met the standard in the performance of this surgery?"

A.: "Yes, he did not meet the standard of care by placing the nipples too high."

. . .

Q.: "And why can't you fix [high nipples]?"

A.: "There's no way to raise the nipple after you've placed it too high. There's just no way."

11

Contrary to Dr. Medina's argument, Dr. Weinstein did testify that Dr. Medina caused Rocha to have high nipples, by failing to use proper measurements. Although Dr. Medina, as well as his expert, Dr. Pandya, testified that the standard of care only requires that a physician take the inframammary fold measurement to determine nipple placement, the jury were free to credit or discredit some or all of either Dr. Pandya's or Dr. Weinstein's testimony as to what measurements or assessments were required by the standard of care. See Doull, 487 Mass. at 19-20 (upholding jury instruction requiring jurors to determine which expert opinion they credit as to appropriate standard of care). Furthermore, while Dr. Pandya testified that Rocha's high nipples resulted from bottoming out, Dr. Weinstein disagreed and stated that Dr. Medina placed the nipples too high on Rocha's chest during the first surgery.[12] Dr. Weinstein also provided extensive testimony as to why bottoming out would not have caused Rocha to have high nipples.[13] Given these

---

[12] Here again, the jury were free to credit either expert as to whether bottoming out was an inherent risk of a breast reduction procedure. See Leibovich v. Antonellis, 410 Mass. 568, 573 (1991) (jury's duty "is to assess the soundness and credibility" of expert opinions).

[13] Dr. Weinstein testified that bottoming out only changes the orientation of the nipple rather than its position on the breast and does not cause the entire areola-nipple complex to rise.

conflicting views, it was the jury's function to resolve the conflicts in the testimony and to credit either Dr. Pandya or Dr. Weinstein's testimony as to the cause of Rocha's high nipples.  See Delta Materials Corp. v. Bagdon, 33 Mass. App. Ct. 333, 335 (1992) (presented with battle of experts, fact finder may reject some opinions and accept others).  As such, there was sufficient evidence for a jury to conclude that Dr. Medina's negligence caused Rocha's condition.

3.  Jury of twelve.  Dr. Medina finally argues that the judge erred in denying his request for a new trial because he was tried before a jury of six rather than a jury of twelve in violation of Article 15 of the Massachusetts Declaration of Rights.[14]  Dr. Medina cites historical treatises, law review articles, and entries from John Adams's diary in an effort to persuade us to revisit the longstanding principle that Article 15, "while guaranteeing trial by jury in certain civil cases, does not prescribe the number of jurors."[15]  Doyon v. Providence

---

[14] Dr. Medina was tried before a jury of six pursuant to the Supreme Judicial Court's seventh updated order regarding court operations under the exigent circumstances created by the COVID-19 pandemic.

[15] Article 15 of the Massachusetts Declaration of Rights secures the right to a trial by jury in "all controversies concerning property, and in all suits between two or more persons."

13

& Worcester R.R. Co., 31 Mass. App. Ct. 751, 753-754 (1992).  We

decline to do so.[16]

Judgment affirmed.

Orders denying postjudgment
  motions affirmed.

By the Court (Desmond,
  Walsh & Toone, JJ.[17]),

Clerk

Entered:  March 3, 2025.

---

[16] Because Article 15 does require a jury of twelve members, we need not analyze whether the seventh updated order satisfied strict scrutiny.

[17] The panelists are listed in order of seniority.

14